IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 22, 2025 Session

## STATE OF TENNESSEE v. SERENA N. HAMMOND

**Appeal from the Criminal Court for Knox County**
**No. 122688   G. Scott Green, Judge**

_____

**No. E2024-00357-CCA-R3-CD**

_____

Serena N. Hammond, Defendant, was indicted by a Knox County Grand Jury for one count of aggravated assault with a deadly weapon in Count 1, one count of aggravated burglary acting in concert with two or more other persons in Count 2, and one count of attempted second degree murder in Count 3. Defendant was convicted as charged in Counts 1 and 2 and convicted of attempted voluntary manslaughter in Count 3. Defendant was sentenced to an effective sentence of ten years in incarceration as a standard offender. Defendant appealed, arguing that (1) the evidence was insufficient to support her conviction for aggravated burglary acting in concert; (2) the trial court committed reversible error by admitting photographs of a gun and magazine recovered from a car in which she was pulled over fifteen days after the incident; (3) the trial court committed reversible error by admitting recordings of Defendant's phone call made from jail to a co-defendant; (4) the trial court improperly considered Defendant's false testimony at trial and the location of the offense in enhancing her sentence for aggravated burglary acting in concert; and (5) the cumulative effect of these errors deprived her of the right to a fair trial. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and STEVEN W. SWORD, JJ., joined.

Eric M. Lutton, District Public Defender; Johnathan Harwell (on appeal); and David D. Skidmore (at trial), Knoxville, Tennessee, for the appellant, Serena N. Hammond.

Jonathan Skrmetti, Attorney General and Reporter; John Cerisano, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Defendant was indicted alongside two other co-defendants, Sergio Rangel and Shamar Rowe. Both Mr. Rangel and Mr. Rowe were also charged with aggravated burglary acting in concert with two or more other persons in Count 2 only. All three co-defendants were tried together, and the following facts were adduced at trial.

In June of 2022, Elizabeth Allen lived in Knoxville, Tennessee, with her granddaughter, Taylor Blair, and her granddaughter's boyfriend, Bryce Smith. Ms. Allen's other granddaughter, Hannah Blair,[1] and her boyfriend, Donte Hammond, lived with Ms. Allen for a period of time prior to June of 2022. Mr. Hammond is Defendant's brother. Ms. Hannah Blair and Mr. Hammond lived with Ms. Hannah Blair's grandfather at the time of the incident. After the move, some of Mr. Hammond's personal belongings remained at Ms. Allen's home.

Mr. Hammond was later detained and placed in custody by law enforcement on an unrelated matter. On June 11, 2022, Mr. Hammond made a series of audiovisual calls from jail to Defendant. At 6:08 p.m., Mr. Hammond called and asked Defendant to contact Ms. Hannah Blair because she had not answered his calls. Several minutes later, Mr. Hammond called Defendant again and expressed his annoyance with Ms. Hannah Blair's refusal to answer. He and Defendant discussed the possibility of Defendant going to Ms. Hannah Blair's home to get in contact with her. In the second video, Defendant was in a vehicle and stated that the only other occupant was a man named C.J. At 6:24 p.m., Mr. Hammond placed a third call to Defendant, explicitly requesting Defendant to "go by [Ms. Hannah Blair's] granny['s] crib[,]" and Defendant agreed. In the same call, Mr. Rangel appears on screen and speaks with Mr. Hammond. At 8:27 p.m., Mr. Hammond made his final call to Defendant to discuss going to Ms. Allen's home. In this call, Mr. Rowe entered the frame of the video, and Mr. Hammond instructed Mr. Rowe to "get the f[***] off the camera" because Mr. Hammond "was not f[***]ing with [him]."

On June 11, 2022, Ms. Allen clocked out from her night shift at CVS sometime between 7:00 a.m. and 8:00 a.m. Once home, Ms. Allen went to sleep but was later awoken by a text from Ms. Taylor Blair at approximately 9:14 p.m. Ms. Allen heard someone beating on the front door, so she got dressed and went to answer it. When Ms. Allen opened the door, she discovered that Defendant was the one beating on the door. Ms. Allen testified that she heard Defendant speaking while walking back to Defendant's car, but Ms.

---

[1] Because Taylor Blair and Hannah Blair have the same last name, we will refer to them by their full names to avoid confusion.

Allen could not hear exactly what was said because the dog was barking "like mad." When looking out the front door, Ms. Allen noticed that there were five cars parked in the road in front of her home, and several men accompanied Defendant, including Mr. Rangel and Mr. Rowe.

Ms. Allen testified that when she gestured to Defendant that she could not hear because of the barking, Defendant returned to the front door and demanded Ms. Allen to send Ms. Hannah Blair and Mr. Smith outside. Ms. Allen explained that she told Defendant that neither Ms. Hannah Blair nor Mr. Smith was at the home, and she instructed Defendant and the men to leave the property. Ms. Allen testified that Defendant returned to a yellow sports car parked in front of her home and retrieved a "black handgun . . . [with] an extended clip" from the driver's side. Ms. Allen claimed that Defendant returned to the front door and threatened to shoot her, and Mr. Rangel told Ms. Allen that if she touched Defendant, he would hit Ms. Allen. Defendant eventually returned the gun to the yellow sports car without firing. Ms. Allen and Defendant continued to "exchange[] words" while Ms. Allen held the dog by the collar to prevent the dog from "get[ting] loose."

Ms. Allen testified that during the verbal exchange, Defendant punched her in the nose. Ms. Allen stated that she attempted to shut the front door, but Defendant forced her way into Ms. Allen's home and continued to punch Ms. Allen. Ms. Allen testified that she saw Mr. Rangel and Mr. Rowe enter the home during the fight, and one of them instructed, "Get the dog." Ms. Allen further claimed that Mr. Rangel and Mr. Rowe took the dog to a bedroom of Ms. Allen's home and locked it inside. Ms. Allen testified that during the scuffle between her and Defendant, Ms. Allen attempted to grab a metal baseball bat that she kept behind the front door for protection. However, Defendant disarmed Ms. Allen and continued to beat Ms. Allen with her fists, and Defendant bit Ms. Allen on the cheek. Defendant then beat Ms. Allen with the metal bat in the back of her head. At some point during the altercation, Ms. Allen noticed a cell phone light pointed in the direction of her and Defendant, but she testified that she could not tell whether the person holding the phone was recording the altercation. Ms. Allen claimed that the altercation ended when Defendant requested, "Somebody get this b[****] off me, she's bleeding all over me." Defendant instructed Ms. Allen, "Don't call the cops. We'll come back." Defendant and the other men quickly left the scene. Ms. Allen testified that the entire event occurred in approximately fifteen to twenty minutes, and she admitted that she perceived the altercation as being only between her and Defendant. She stated, "[Mr. Rangel and Mr. Rowe were] not in it. They were never accused of being in the assault on me."

Defendant testified that she went to Ms. Allen's home to retrieve Mr. Hammond's personal belongings that were left there after his move. She claimed that when she arrived at the home, she texted Ms. Taylor Blair that she was at Ms. Allen's home. Defendant knocked on the door for around two minutes before Ms. Allen answered the door.

According to Defendant, Ms. Allen was speaking in a slurred manner and appeared intoxicated, and Defendant could not understand her. Eventually, Defendant informed Ms. Allen that she was there to retrieve Mr. Hammond's belongings, and Defendant stated that Ms. Allen "started coming for [her] and [Ms. Allen] spit in [Defendant's] face." Defendant further testified that Ms. Allen attempted to sic her dog on her, but when the dog did not attack, Ms. Allen placed it in the back of the house.

Defendant claimed that after Ms. Allen spat in her face, Ms. Allen told her to "hold on a second[.]" Defendant testified that she then stepped into the home because she believed that Ms. Allen was retrieving Mr. Hammond's belongings. Defendant testified that Ms. Allen returned from her room with a baseball bat. Defendant claimed that she turned to leave through the front door after seeing Ms. Allen with the bat, but Ms. Allen "jumped on [Defendant's] back" and hit Defendant two to four times on her head with the bat. Defendant took the bat from Ms. Allen and hit her two to three times with the bat before throwing the bat to the ground. Defendant explained that she called for someone to remove Ms. Allen from her back, but no one responded. Defendant testified that she eventually removed Ms. Allen by herself and pushed her into a wall before fleeing. Defendant denied biting Ms. Allen on the cheek and testified that no other person entered Ms. Allen's home during the incident. Defendant further denied possessing a gun on the night of the incident.

Defendant explained that she brought the men to Ms. Allen's home to help her move Mr. Hammond's belongings because it was "quite a bit of things[.]" She testified that she did not go to Ms. Allen's home with the intention of getting into a physical altercation. Defendant denied she asked Ms. Allen whether Ms. Hannah Blair or Mr. Smith were at Ms. Allen's home or demanded Ms. Allen bring them outside. Defendant admitted that she did not sustain any injuries as a result of the alleged assault on her and that she did not attempt to report the incident to law enforcement.

After Defendant and the others left the home, Ms. Allen called law enforcement, informing them that Defendant had assaulted her. She further reported that Defendant threatened her with a gun during the altercation and that Defendant was traveling in a yellow sports car on the night of the incident. When law enforcement arrived at the home, Ms. Allen provided them with a statement. Ms. Allen was taken to the hospital, where hospital personnel performed a CT scan and x-rays. Ms. Allen suffered a fractured nose and "two big gashes on the right side of [her] head." Ms. Allen suffered an injury to her cheek where she claimed that Defendant bit her.

On June 13, 2022, Officer Joshua Shaffer of the Knoxville Police Department was charged with the investigation of the identity of the individuals other than Defendant involved in the incident. During his investigation, Officer Shaffer recovered video footage

of the incident captured by the home security camera of Ms. Allen's neighbor. From the video, Officer Shaffer recognized a yellow Chevrolet Cobalt that he knew was primarily used by Defendant, Mr. Rangel, and another man named Brandon Woods.

Officer Shaffer also obtained a statement from Ms. Allen, who informed him that Defendant assaulted her immediately after Ms. Allen requested Defendant and the other men leave the property. In her statement to Officer Shaffer, Ms. Allen claimed that she was unable to recall whether anyone other than Defendant entered her home on the night of the incident. Officer Shaffer also obtained statements from a few of Ms. Allen's neighbors. However, only one neighbor stated that he was aware of the incident, providing that he noticed a few cars blocking the road and a few individuals walking in front of Ms. Allen's home.

The jury found Defendant guilty of aggravated assault with a deadly weapon in Count 1, aggravated burglary acting in concert in Count 2, and attempted voluntary manslaughter in Count 3. The jury found Mr. Rangel guilty of facilitating aggravated burglary in Count 2 and Mr. Rowe guilty of aggravated criminal trespass in Count 2. After a sentencing hearing, the trial court imposed an effective sentence of ten years' incarceration at the Tennessee Department of Correction.

Defendant moved for a new trial, and a hearing on the motion was held on February 29, 2024. Defendant argued, as relevant to this appeal, that she was entitled to a new trial because the evidence was insufficient to support her convictions; the jury's verdict finding Defendant guilty of aggravated burglary acting in concert was inconsistent with its verdicts acquitting Mr. Rangel and Mr. Rowe of the same offense; the trial court erred by admitting the photographs of the gun and the magazine recovered from the yellow sports car in which Defendant and Mr. Woods were pulled over fifteen days after the incident; and the trial court erred by denying Defendant's motion to exclude jail phone recordings from Defendant to Mr. Rangel. The trial court denied the motion, and Defendant timely appealed.

*Analysis*

*Sufficiency of the Evidence*

Defendant asserts that there was insufficient evidence to support her conviction for aggravated burglary acting in concert. Specifically, Defendant conceded at oral argument that the evidence was sufficient for the jury to convict her of aggravated burglary but maintained that the evidence was insufficient for the jury to convict her of aggravated burglary acting in concert with two or more other persons because the jury acquitted both Mr. Rangel and Mr. Rowe of the same offense. Alternatively, Defendant argues that the

evidence was insufficient to find that Mr. Rangel and Mr. Rowe were acting in concert with Defendant. The State responds that the evidence was sufficient on both grounds. We agree with the State.

When examining whether the evidence presented at trial was sufficient to support a conviction, several well-settled principles guide our analysis. We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The defendant bears the burden on appeal to demonstrate that the evidence is insufficient to support his conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

"[A] jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State*." State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled on appeal to "the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Questions as to the credibility of witnesses and the weight of the evidence, as well as factual issues raised by such evidence, are resolved by the trier of fact, not this Court. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). These principles guide us "'whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

As relevant to this issue, Defendant was convicted of aggravated burglary acting in concert. A person commits aggravated burglary when he or she, without the consent of the owner, "[e]nters a [habitation] . . . not open to the public, with the intent to commit a felony, theft, or assault." T.C.A. §§ 39-13-1002; -1003. Tennessee Code Annotated section 39-12-302(a) provides that "a crime of force or violence committed while acting in concert with two (2) or more other persons shall be classified one (1) classification higher than if it was committed alone." "Crime of force or violence" is defined to include "aggravated burglary." *Id.* § -301(2)(C). "Acting in concert" is defined as "such conduct that would make one criminally responsible[.]" *Id.* § -301(1). As prosecuted in this case, a person is "criminally responsible" for criminal conduct of another when "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of

- 6 -

the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id.* § -11-401, 402(2). It is no defense to a charge of criminal responsibility that "[t]he person for whose conduct the defendant is criminally responsible has been acquitted[.]" *Id.* § -407(2). Because Defendant concedes, and we agree, that the evidence was sufficient to sustain a conviction for aggravated burglary, our review of the issue is limited to whether the evidence was sufficient for the jury to conclude that Defendant acted in concert with two or more other persons in committing the aggravated burglary.

Defendant first argues that the evidence was insufficient to sustain her conviction for aggravated burglary acting in concert because both Mr. Rangel and Mr. Rowe were acquitted of the same offense. Defendant's argument is essentially an argument against inconsistent verdicts, which our supreme court has ruled as insufficient grounds for reversal. *See State v. Davis*, 466 S.W.3d 49, 77 (Tenn. 2015). An appellate court "will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned." *Wiggins v. State*, 498 S.W.2d 92, 94 (Tenn. 1973). Defendant nevertheless argues that Tennessee courts recognize a limited exception to this general rule where all participants in the offense are identically charged with and jointly tried for an offense that by its nature requires the concerted efforts of the participants. In such a case, Defendant argues that the acquittal of all but one of the co-defendants requires the acquittal of the remaining defendant.

In support of this contention, Defendant relies on this Court's decision in *Jackson v. State*, 477 S.W.2d 213 (Tenn. Crim. App. 1971), finding:

> [w]here several persons are jointly indicted and tried for an offense which may be committed by one person alone, *as distinguished from crimes which can be committed only by two or more acting in concert*, the jury may, by separate verdict, convict one or more and acquit the others or disagree as to the others.

*Id.* at 215 (emphasis added). The *Jackson* case involved co-defendants who were identically charged with and jointly tried for an armed robbery that the co-defendants committed together in 1969. *Id.* at 214. The jury convicted one of the co-defendants but acquitted the other. *Id.* However, a conviction for armed robbery at the time did not require the concerted actions of two or more individuals. *See* T.C.A. § 39-3901 (1969). Consequently, the issue of whether inconsistent verdicts are permissible in cases of co-defendants jointly tried on charges requiring concerted action was not before the *Jackson* court, and our discussion on the issue was dicta. *See Staten v. State*, 232 S.W.2d 18, 19 (1950) (providing that dicta is an expression by a court that is "not necessary for a determination of the lawsuit" and is "not binding as an authority or a precedent").

Additionally, Defendant has failed to point to any authority citing to *Jackson* for her proposed exception, and our research has uncovered none.

Defendant also points to our supreme court's decision in *Davis* for support. 466 S.W.3d 49. In *Davis*, our supreme court noted that where multiple defendants are tried together on identical charges of conspiracy and all but one of the defendants are acquitted, a conviction of the remaining defendant would be reversed for inconsistency. *Id.* at 72, n.12 (citing *State v. Copeland*, 983 S.W.2d 703, 707 (Tenn. Crim. App. 1998)). Reversal of the remaining conviction is compelled because "conspiracy requires an agreement between two or more persons." *Id.* In first recognizing this rule, the supreme court in *Delaney v. State* relied on "an unbroken rule at common law, with cases on the point dating as early as A.D. 1410" and "found no dissent from this proposition." 51 S.W.2d 485, 487 (Tenn. 1932). However, Defendant has failed to cite to any authority holding that this rule should be applied outside of the conspiracy context.[2]

In any event, we decline Defendant's offer to decide whether her proposed exception is applicable outside of the context of conspiracy because her argument is unavailing for another reason. As detailed above, Tennessee Code Annotated section 39-12-301(1) defines "[a]cting in concert" as "conduct that would make one criminally responsible[,]" and section 39-11-407(2) provides that it is no defense to a theory of criminal responsibility that "[t]he person for whose conduct the defendant is criminally responsible has been acquitted[.]" Therefore, we find that the acquittal of Mr. Rangel and Mr. Rowe for aggravated burglary in concert does not prevent Defendant's conviction for the same offense.

We are also "satisfied that the evidence establishes the guilt of the offense upon which [Defendant's] conviction was returned." *Wiggins*, 498 S.W.2d at 94. On this point, Defendant concedes that the evidence is sufficient to support a conviction for aggravated burglary, and we agree. However, Defendant argues that the evidence was insufficient for

---

[2] Tennessee Code Annotated section 39-12-103(a) states, "The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, *agree* that one (1) or more of them will engage in conduct that constitutes the offense." (Emphasis added). "The essence of a conspiracy is an agreement to accomplish a criminal or unlawful act." *State v. Hodgkinson*, 778 S.W.2d 54, 58 (Tenn. Crim. App. 1989) (citing *Owens v. State*, 84 Tenn. 1, 3 (1885)). On the other hand, criminal responsibility for the conduct of another does not require any form of agreement between co-defendants. The principal offender does not even have to be aware that another is acting with intent to promote or assist the commission of the offense. Thus, in this context, there is a significant distinction between acting in concert and conspiracy.

the jury to conclude that Mr. Rangel and Mr. Rowe were acting in concert with Defendant in burglarizing Ms. Allen's home. The State argues that the evidence was sufficient.

In a light most favorable to the State, the evidence at trial indicated that Mr. Hammond placed several jail phone calls to Defendant on the day of the incident prior to the burglary of Ms. Allen's home. In the series of video calls, both Mr. Rangel and Mr. Rowe could be seen accompanying Defendant while Mr. Hammond instructed Defendant to go to Ms. Allen's home to determine whether Ms. Hannah Blair was there. Defendant agreed to go to Ms. Allen's home and arrived there with several men, including Mr. Rangel and Mr. Rowe. Defendant beat on Ms. Allen's front door for several minutes until Ms. Allen answered. Defendant then demanded that Ms. Allen send Ms. Hannah Blair and Mr. Smith outside. When Ms. Allen refused, Defendant retrieved a gun and threatened to shoot Ms. Allen. Despite returning the gun to the car without firing, Defendant continued to argue with Ms. Allen, and Mr. Rangel threatened to hit Ms. Allen if Ms. Allen touched Defendant. During the verbal exchange, Ms. Allen instructed Defendant and the men to leave the property, and Defendant punched Ms. Allen in the nose. Defendant forced herself into Ms. Allen's home and began to punch her and beat her with a metal baseball bat when Ms. Allen attempted to defend herself. Mr. Rangel and Mr. Rowe followed Defendant into the home without Ms. Allen's consent and placed Ms. Allen's dog, which was barking "like mad," in another room, away from the altercation. When Defendant requested someone remove Ms. Allen from her back, one of the men complied, and Defendant, Mr. Rangel, Mr. Rowe, and the other men left the property. Neither Mr. Rangel nor Mr. Rowe called law enforcement or aided Ms. Allen. From this evidence, a reasonable jury could conclude that Mr. Rangel and Mr. Rowe "[a]cted to promote or assist" Defendant in the commission of the aggravated burglary on Ms. Allen's home by aiding her therewith. *See* T.C.A. §§ 39-11-401(2); *see also* -12-301(1). Defendant is not entitled to relief on this issue.

### *Admission of the Photograph*

Next, Defendant argues that the trial court committed reversible error by admitting a photograph of the gun and magazine recovered from the yellow sports car in which Defendant and Mr. Woods were pulled over by law enforcement fifteen days after the incident. Defendant asserts that the photograph was irrelevant, or to the extent that it was relevant, its relevancy was substantially outweighed by its danger of confusing the jury. The State responds that the photograph was relevant and that its admission did not confuse the jury. We agree with the State.

The admissibility of photographic evidence lies within the sound discretion of the trial court, and its ruling on admissibility will not be disturbed on appeal absent a showing of an abuse of that discretion. *State v. Carruthers*, 35 S.W.3d 516, 576-77 (Tenn. 2000);

*State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978) (quoting Tenn. R. Evid. 403 Advisory Comm. Cmts.). Relevant evidence is admissible at trial unless exclusion is required by the United States Constitution, the Tennessee Constitution, or another Tennessee rule or law. Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. However, excluding evidence under Rule 403 "'is an extraordinary step that should be used sparingly.'" *Old Republic Life Ins. Co. v. Woody*, 652 S.W.3d 418, 430 (Tenn. Ct. App. 2022) (quoting *Goodale v. Langenberg*, 242 S.W.3d 575, 587 (Tenn. Ct. App. 2007).

During the cross-examination of Defendant, the State sought to introduce photographs of a gun and an extended magazine recovered from the yellow sports car in which Defendant and Mr. Woods were pulled over. During a jury-out hearing, Defendant explained that on June 26, 2022, she and Mr. Woods were delivering food through DoorDash in the yellow sports car when they were pulled over by law enforcement. She and Mr. Woods were ordered to step out of the car, and law enforcement conducted a search of the car. The search revealed a black handgun and an extended magazine matching the description of the gun used by Defendant to threaten Ms. Allen on the night of the incident. Defendant admitted the gun and magazine were her mother's. The State sought to introduce the photographs to impeach Defendant's testimony that she did not possess a gun on the night of the incident and to reinforce Ms. Allen's testimony to the contrary. Defense counsel objected to the admission of the photographs, arguing that the circumstances under which the gun and magazine were recovered were too attenuated from the night of the incident. The trial court overruled the defense objection and admitted the photographs, finding that they were relevant evidence tending to impeach Defendant's testimony that she did not threaten Ms. Allen with a gun because the gun and magazine matched the description of the gun provided by Ms. Allen and was found fifteen days after the incident in the yellow sports car used by Defendant on the night of the incident. The trial court further delivered limiting instructions to the jury, instructing that the photographs were to only be considered for impeachment purposes.

Defendant claims that the photograph of the gun was irrelevant because evidence that Defendant was pulled over in the car from which the gun was recovered fifteen days after the incident does not make it more probable that she had the gun on the night of the incident. To support her argument, Defendant cites *State v. Frazier*, No E2018-00202-CCA-R3-CD, 2019 WL 2750138 (Tenn. Crim. App. July 1, 2019), *no perm. app. filed*. In *Frazier*, the defendant was convicted of first degree premeditated murder based on an allegation that the defendant shot and killed another man. *Id.* at \*1, 17. During trial, the

- 10 -

trial court allowed the State to elicit testimony from a witness that the defendant possessed a gun on the day prior to the shooting. *Id.* at *4. In finding reversible error, this Court determined that the testimony was irrelevant because "no evidence connected the Defendant's previous gun possession to the gun used in the victim's shooting." *Id.* at *20-21.

*Frazier* is distinguishable from Defendant's case because there is evidence connecting the gun and magazine recovered from the yellow sports car and the gun used on the night of the incident. Ms. Allen testified that on the night of the incident, Defendant retrieved a "black handgun . . . [with] an extended clip" from the driver's side of a yellow sports car. The gun and magazine depicted in the photographs at issue matched the description provided by Ms. Allen and were retrieved from the same yellow sports car in which Defendant was traveling on the night of the incident. Moreover, Ms. Allen testified that Defendant retrieved the gun from and later returned it to the yellow sports car on the night of the incident, and Defendant testified that the gun and magazine recovered by law enforcement were her mother's.

Defendant further responds that the photographs were irrelevant to impeach Defendant's testimony because Defendant did not testify that she never possessed a gun or that there was not a gun in the car. However, Defendant testified that she did not threaten Ms. Allen with a gun on the night of the incident, and the fact that Ms. Allen accurately described the gun recovered and the car from which it was recovered tends to make Defendant's version of events less probable. *See* Tenn. R. Evid. 401. Therefore, the trial court did not abuse its discretion by ruling the photographs as relevant impeachment evidence.

The trial court also did not abuse its discretion by not excluding the photographs under Rule 403. Defendant argues that the relevancy of the photographs was substantially outweighed by their danger of confusing the jury because admission "implied to the jury that the mere existence of the gun somehow reflected poorly on [Defendant] . . . [and] distracted the jury from proper consideration of the actual facts at issue." However, Defendant does not identify how the admission of the photographs implied to the jury anything other than the fact that Defendant was dishonest at trial, which the State was entitled to imply. Furthermore, the trial court instructed the jury that the photographs were only to be considered for impeachment purposes, further lessening the danger of confusion. Defendant is not entitled to relief on this issue.

*Admission of Jail Phone Recordings*

Defendant next argues that the trial court committed reversible error by admitting a recording of a jail phone call by Defendant to Mr. Rangel. Specifically, Defendant asserts

that admission of the recording was improper because the State failed to disclose it during discovery. Recognizing that trial counsel failed to raise this issue in her motion for new trial, Defendant requests plain error relief. The State argues that Defendant is not entitled to plain error relief. We agree with the State.

In criminal cases, the doctrine of plain error permits appellate courts to consider issues that were not raised in the trial court. Tennessee Rule of Appellate Procedure 36(b) states in part that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." It is well-settled that the discretionary authority to invoke the plain error doctrine should be "sparingly exercised," *State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007), because "appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbitrators of legal questions presented and argued by the parties before them." *State v. Northern*, 262 S.W.3d 741, 766 (Tenn. 2008) (Holder, J., concurring and dissenting) (quoting *Carducci v. Regan*, 714 F.2d 171, 177, 230 U.S. App. D.C. 80 (D.C. Cir. 1983)).

To determine whether a trial error rises to the level of justifying "plain error" review, we look to the following five factors:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014). Even if all five factors are present, "the plain error must be of such a great magnitude that it probably changed the outcome of the trial." *Id.* (quoting *Adkisson*, 899 S.W.2d at 642). "[O]nly 'rarely will plain error review extend to an evidentiary issue[.]'" *State v. Haymer*, 671 S.W.3d 568, 578 (Tenn. Crim. App. 2023) (quoting *State v. Scoville*, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007)).

On cross-examination, Defendant was asked whether she made a call from jail to Mr. Rangel after being arrested in this case. Defendant testified that she did not remember calling anyone. The State then asked whether Defendant remembered talking to her mother

about a video recording of the altercation, and Defendant denied such a conversation. For purposes of impeachment, the State sought to introduce an audio recording of a jail phone call made from Defendant to Mr. Rangel in which Defendant's mother stated, "We're fighting this in court. We've got the video. We're fighting this in court." Defense counsel objected to the admission of the jail call recording, alleging that the State failed to disclose the recording prior to trial. The trial court overruled the objection and allowed the recording to be admitted for impeachment purposes, finding that the State was allowed to introduce Defendant's statement on cross-examination. Even after being presented with the jail call recording, Defendant testified that she was unaware of any video recording of the altercation.

From the record, the trial court appears to have confused the rule governing the admission of oral statements by a defendant with the rule governing the admission of recorded statements. Where the defendant requests disclosure of his or her oral statements, the State is only required to disclose such if the State intends to offer the oral statement "in evidence at the trial." Tenn. R. Crim. P. 16(a)(1)(A). However, where the statement is recorded, as here, a defendant is entitled upon request to the disclosure of such recorded statement "if: (I) the statement is within the state's possession, custody, or control; and (II) the district attorney general knows—or through due diligence could know—that the statement exists[.]" *Id.* 16(a)(B)(i). For the latter, it is immaterial whether the State seeks to introduce the statement into evidence. *Id.* The parties do not dispute that Defendant made a proper request for her statements.

Despite this error in the trial court's application of Rule 16, Defendant is not entitled to plain error relief. As an initial matter, Defendant cannot show that the trial court would have ordered exclusion of the recording. Under Rule 16, a trial court's options when faced with a discovery violation are not limited to exclusion and include ordering discovery or inspection, granting a continuance, and "entering such other order as it deems just under the circumstances." Tenn. R. Crim. P. 16(d)(2). Moreover, "[a] trial court has wide discretion in fashioning a remedy for non-compliance with a discovery order[,]" *State v. Downey*, 259 S.W.3d 723, 737 (Tenn. 2008) (citing *State v. Collins*, 35 S.W.3d 582, 585 (Tenn. Crim. App. 2000)), and "[e]xclusion of evidence is a 'drastic remedy and should not be implemented unless there is no other reasonable alternative.'" *State v. Gann*, (Tenn. Crim. App. 2007) (quoting *State v. Smith*, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995)). Defendant has not shown that a clear and unequivocal rule of law has been breached.

Furthermore, even if the trial court had exercised its discretion to order exclusion, the jury would have still been presented with extensive evidence of Defendant's guilt at trial. In addition, the extent to which Defendant's testimony was impeached is unclear. In the phone call, Defendant's mother appeared to reference the video recording in a manner that indicated the video supported Defendant's case, stating, "We've got the video. We're

fighting this in court." Defendant also testified that she was unaware of any video recording and that she did not recall speaking with her mother about a video recording, which does not negate the existence of the video recording. Finally, the recording only served to impeach Defendant on a collateral fact. *See State v. Leach*, 148 S.W.3d 42, 56 (Tenn. 2004) ("A fact is collateral . . . if it is relevant only because it contradicts something said in court"). The recording of the altercation was not necessary to any of the charges brought against Defendant or to Defendant's defense. Its admission was solely relevant for impeaching Defendant's credibility. Defendant has not shown that a substantial right was adversely affected or that consideration of the issue is necessary to do substantial justice. Defendant is not entitled to plain error relief.

*Sentencing*

Defendant argues that the trial court erred by sentencing her to ten years' incarceration for her aggravated burglary conviction because, in enhancing her sentence, the trial court improperly relied upon Defendant's false testimony at trial and the fact that the offense took place in Ms. Allen's home. Consequently, Defendant requests this Court to reduce her sentence to eight years and order it to be served concurrently with her other sentences on probation. The State responds that the trial court did not err by relying on such in enhancing Defendant's sentence. We agree with the State.

"[S]entences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, and the sentencing decision of the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709-10. "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Gevedon*, 671 S.W.3d 537, 543 (Tenn. 2023) (quoting *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010)). The party challenging a sentence bears the burden of demonstrating its impropriety. T.C.A. § 40-35-101, Sentencing Comm'n Cmts.; *see also State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In reaching its decision, the trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar

offenses in Tennessee; (7) any statement made by the defendant on his own behalf; and (8) the results of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. §§ 40-35-102, -103, -210(b). Additionally, the sentence imposed "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(2), (4).

While a trial court should consider enhancement and mitigating factors, they are advisory only. *Id.* § 40-35-113, -114; *see also Bise*, 380 S.W.3d at 701. A trial court should not consider an enhancement factor if it is "an essential element of the offense." *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). However, misapplication of an enhancement or mitigating factor does not invalidate the presumption of reasonableness so long as the trial court articulates reasons consistent with the purposes and principles of sentencing. *Bise*, 380 S.W.3d at 705-06. An appellate court will not reweigh the enhancement and mitigating factors considered by the trial court in determining the appropriate length of sentencing. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008) (citing *State v. Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007)).

Defendant was sentenced as a standard offender for aggravated assault with a deadly weapon in Count 1, aggravated burglary in concert in Count 2, and attempted voluntary manslaughter in Count 3. Aggravated assault with a deadly weapon is a Class C felony. T.C.A. § 39-13-102(e)(1)(A)(ii)(a). Attempted voluntary manslaughter is also a Class C felony. *Id.* §§ 39-12-107(a), -13-211(b). The sentencing range for Class C felonies committed by a standard offender is three to six years. *Id.* § 40-35-112(a)(3). The trial court imposed a sentence of six years for Defendant's aggravated assault with a deadly weapon conviction and four years for her attempted voluntary manslaughter conviction. Aggravated burglary in concert with two or more other persons is a Class B felony. *Id.* §§ 39-12-302(a), -13-1003(b). The sentencing range for Class B felonies committed by a standard offender is eight to twelve years. *Id.* § 40-35-112(a)(2). The trial court imposed a sentence of ten years for Defendant's aggravated burglary in concert conviction. Consequently, each of Defendant's sentences were within range.

At the sentencing hearing, Ms. Allen delivered a victim impact statement on behalf of the State, wherein she discussed the effect that the incident had on her. She explained that she lived in fear of retaliation and suffered from memory loss. She further detailed that she was forced to take off work for two weeks after the incident because of her injuries and that her mother had to help supplement her income.

Defendant gave an allocution, wherein she apologized to Ms. Allen for causing her pain. Defendant expressed that she should have approached the situation differently, and

she emphasized that she has grown as a person since the incident. She concluded by explaining her intention to be a "peaceful and productive member of the community" if the trial court gave her a second chance.

The State introduced a copy of Defendant's presentence report and argued that enhancement factors (5) and (6) applied to each of Defendant's convictions because Defendant treated Ms. Allen with exceptional cruelty and Ms. Allen's injuries were particularly great. *See* T.C.A. § 40-35-114(5), (6). It further argued that enhancement factor (2) applied to Defendant's aggravated assault and attempted voluntary manslaughter convictions because Defendant was a leader in both offenses and acted in concert with Mr. Rangel and Mr. Rowe in their commission. *See id.* § -114(2). The State also argued that enhancement factor (9) applied to Defendant's aggravated burglary and attempted voluntary manslaughter convictions because Defendant employed a firearm during the commission of both offenses. *See id.* § -114(9).

Defendant argued that enhancement factor (2) was inapplicable because there was no evidence that Defendant gave instruction to either Mr. Rangel or Mr. Rowe, except for Defendant's order to get Ms. Allen off of her. *See id.* § -114(2). She further argued that enhancement factors (5) and (6) were inappropriate because Ms. Allen's injuries were not beyond those expected from an aggravated assault and they did not require medical intervention. *See id.* § -114(5), (6).

Regarding mitigating factors, Defendant argued that mitigating factor (6) applied because Defendant was nineteen years old at the time of the offenses and thereby lacked substantial judgment in its commission. *See id.* § -113(6). Defendant further asserted that mitigating factors (11) and (12) were applicable because the offense was committed under the unusual circumstances of Defendant's being subject to the influence and domination of her brother, indicating that Defendant did not form a sustained criminal intent. *See id.* § -113(11), (12).

Defendant also filed a sentencing memorandum, wherein she argued that eight years of probation was an appropriate effective sentence. Defendant highlighted that she had no previous criminal history and that her childhood was difficult because she "bounc[ed] between foster homes[.]" Defendant further described her relationship with Mr. Hammond as "reliant," and she claimed that she was acting "under significant pressure from a trusted and beloved brother at the time of the offense." Defendant stated that if granted probation, she would seek to live with her mother and grandmother and work to regain custody of her son. She also stated her intention to complete parenting classes and to participate in mental health treatment, including enrolling in an anger management course.

The record also reflects that the trial court considered the purposes and principles of sentencing in imposing Defendant's sentences of incarceration. Specifically, the trial court discredited Defendant's testimony given at trial and found that the giving of false testimony was indicative of criminal behavior. It also considered the circumstances of the offense, observing that Defendant was responsible for "put[ting] the posse together to go" to Ms. Allen's home. The trial court further emphasized that the assault took place in Ms. Allen's home and noted that people "should feel safe in [their] home." The trial court expressly considered but rejected granting Defendant probation, stating, "[y]ou can't walk into someone's home and beat them about the head with a baseball bat and expect to go home on probation." At the sentencing hearing, Defendant gave an allocution, and a copy of Defendant's presentence report was admitted into evidence. The trial court also considered the evidence presented at trial and the mitigating and enhancement factors argued by the parties at the sentencing hearing. Therefore, we review the trial court's sentencing decisions for abuse of discretion with a presumption of reasonableness. *Bise*, 380 S.W.3d at 708.

In determining the appropriate length of sentencing, the trial court applied enhancement factor (1), finding that Defendant had a previous history of criminal convictions or criminal behavior. *See id.* § -114(1). The trial court based the application of this factor on Defendant giving false testimony at trial, as evidenced by the jury's verdicts against Defendant, and explained, "[t]hat constitutes a crime in this state." It further applied enhancement factor (2) to Defendant's aggravated assault conviction, determining that Defendant was the leader of the assault and that the assault involved two or more criminal actors. *See id.* § -114(2). The trial court emphasized that Defendant was "at the center" of "multiple people . . . rolling up" to Ms. Allen's home and stated, "It may have been [Mr. Hammond] that set it up, but [Defendant was] the one on the outside that put the posse together to go up there." The trial court also applied enhancement factor number (9) to the aggravated burglary conviction, explaining that Defendant's use of a baseball bat in the assault constituted the use of a deadly weapon. *See id.* § -114(9).

The trial court recognized that Defendant was young at the time of the offenses and applied mitigating factor (6), but it found that "the enhancement factors greatly outweigh[ed] the mitigating factors." *See id.* § -113(6). It further considered alternative sentencing but provided, "[Defendant] beat with a baseball bat someone almost three times [her] age within her own home. . . . You can't walk into someone's home and beat them about the head with a baseball bat and expect to go home on probation." The trial court sentenced Defendant as a standard offender to serve six years' incarceration for Count 1, ten years' incarceration for Count 2, and four years' incarceration for Count 3. The trial court ordered all sentences to be served concurrently for a total effective sentence of ten years' incarceration in the Tennessee Department of Correction.

Defendant first challenges the trial court's reliance on Defendant giving false testimony at trial for enhancing her sentences. The trial court relied on Defendant's false testimony in applying enhancement factor (1), whether "defendant has a previous history or criminal convictions or criminal behavior[.]" *See* T.C.A § 40-35-114(1). The trial court noted that giving false testimony at trial is "a crime in this state," and the trial court was correct. *See id.* § 39-16-702(a)(1) ("A person commits an offense who, with intent to deceive[, m]akes a false statement, under oath"). Moreover, a trial court may consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed[,]" *Id.* § 40-25-103(5), and "the defendant's truthfulness while testifying on his own behalf is probative of his . . . prospects for rehabilitation[.]" *State v. Dowdy*, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994) (citations omitted). Defendant nevertheless argues that the jury did not completely discredit her testimony because it convicted her of the lesser-included offense of attempted voluntary manslaughter on her charge of attempted second degree murder. However, the jury clearly discredited substantial portions of Defendant's testimony as evidenced by its returning a verdict of guilty as charged on Counts 1 and 2, which stands in contradiction with Defendant's claimed self-defense at trial. The trial court was entitled to consider that fact in enhancing Defendant's sentences. Defendant also asserts that consideration of Defendant's false testimony in this case is not sufficiently indicative of her amenability for rehabilitation because she took responsibility for her actions in her presentence report and allocution. However, we respectfully decline to reweigh the trial court's consideration of Defendant's false testimony and find that the trial court did not abuse its discretion by considering it. *See Carter*, 254 S.W.3d 345.

Defendant next asserts that the trial court improperly considered the fact that the offense took place in Ms. Allen's home when it enhanced her sentence for aggravated burglary because the fact that it took place in a home was an essential element of the offense. During the sentencing hearing, the trial court, as pertinent here, stated:

> With respect to the aggravated assault conviction, clearly, there was multiple people that came rolling up, five carloads is my recollection of people, [Defendant was] at the center of that. [Defendant] organized it. It may have been [Mr. Hammond] that set it up, but [Defendant was] the one on the outside that put the posse together to go up there.

> Ms. Allen did suffer injuries, but I don't think I have to go there. I think this was cruel to beat someone in their own home. I don't have to go there. There clearly was a deadly weapon utilized in the aggravated burglary. A baseball bat. Especially the way it was utilized in this case clearly qualifies as a deadly weapon.

- 18 -

From our review of the record, we disagree with Defendant that the trial court considered the location of the offense in enhancing her sentence for aggravated burglary acting in concert. The trial court appeared to consider this fact in enhancing Defendant's sentence for aggravated assault with a deadly weapon, as evidenced by its statement that it was "cruel to *beat* someone in their own home." (Emphasis added). "Assault," as prosecuted in this case, is defined as "intentionally [or] knowingly [] recklessly caus[ing] bodily injury to another[.]" T.C.A. § 39-13-101(a)(1). Assault is enhanced to aggravated assault if it involves "the use or display of a dangerous weapon[.]" *Id.* § -102(a)(1)(A)(iii). Because the location of the offense is not an "essential element" of aggravated assault, the trial court did not err in considering the location of the aggravated assault. *See Imfeld*, 70 S.W.3d at 704. Defendant is not entitled to relief on this issue.

### *Cumulative Error*

As her final issue, Defendant argues that the cumulative effect of the trial court's errors "fatally infringed" her right to a fair trial. Because we find that the trial court committed no error, Defendant is not entitled to relief on this ground.

### CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.


*S/Timothy L. Easter*
TIMOTHY L. EASTER, JUDGE

- 19 -